## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR T. BOLTON, | ) | Case No. 3:17-cv-69 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| BAY VALLEY FOODS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. Introduction

Arthur Bolton, an African American former employee in Defendant Bay Valley Foods, LLC's ("Bay Valley"), Label and Pack Department, brought this employment discrimination action against Bay Valley, alleging that Bay Valley discriminated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Pennsylvania Human Relations Act ("PHRA") by failing to properly train him as an employee. Bay Valley moved for summary judgment, arguing that Bolton could not make out a prima facie case of discrimination and that Bay Valley lawfully terminated him for violations of its attendance policy. Bay Valley's Motion for Summary Judgment (ECF No. 52) is fully briefed (ECF Nos. 53, 54, 55, 61, 62, 63, 64, 65, 69, 70, 71) and ripe for disposition.

The Court **GRANTS IN PART** and **DENIES IN PART** Bay Valley's Motion. The Court holds that Bolton has made out a claim of race discrimination because a reasonable jury could conclude that Bay Valley trained him differently than Caucasian colleagues under circumstances giving rise to an inference of discrimination. However, the Court holds that Bay Valley is entitled

to summary judgment on Bolton's disability discrimination claims because no reasonable jury could conclude that Bay Valley failed to accommodate Bolton's alleged disability.

## II.     Jurisdiction and Venue

This Court has subject-matter jurisdiction over Bolton's Title VII and ADA claims because they arise under federal law.  28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Bolton's PHRA claims because they form part of the same case or controversy as his Title VII and ADA claims.  28 U.S.C. § 1367(a).

Venue is proper because a substantial part of the events giving rise to Bolton's claims occurred in the Western District of Pennsylvania.  28 U.S.C. § 1391(b)(2).

## III.     Factual Background[1]

On September 8, 2014, Bay Valley hired Bolton to work in its Label and Pack Department. (ECF No. 54 ¶¶ 1–2; ECF No. 61 ¶¶ 1–2.)  Bay Valley hired Bolton as a probationary employee, and he remained on probation until March 8, 2015.  (ECF No. 54 ¶ 3; ECF No. 61 ¶ 3.)  On September 3, 2015, Grant Holloway, the Human Resources Manager at Bay Valley, decided to terminate Bolton's employment because of Bolton's violations of Bay Valley's attendance policy. (ECF No. 54 ¶ 82; ECF No. 61 ¶ 82.)  On September 9, 2015, Bay Valley officially terminated Bolton's employment.  (New Matter ¶ 42; ECF No. 70 ¶ 42.)[2]

---

[1] The Court derives these facts from a combination of Defendants' Concise Statement of Material Facts (ECF No. 54), Plaintiff's Response in Opposition to Defendants' Concise Statement of Material Facts (ECF No. 61), Plaintiff's Additional Counterstatements of Material Fact (also contained in ECF No. 61), Defendants' Reply in Support of its Concise Statement of Material Facts (ECF No. 69), and Defendant's Response in Opposition to Plaintiff's Additional Statement of Material Facts (ECF No. 70).  These facts are undisputed unless otherwise noted.

[2] Plaintiff's Additional Counterstatements of Material Fact are contained in the same document as Plaintiff's Response in Opposition to Defendants' Concise Statement of Material Facts (ECF No. 61).  Therefore, when the Court refers to Plaintiff's Additional Counterstatements of Material Fact, it will cite the statements made therein as "New Matter."

## A. Bolton's Training and Position at Bay Valley

While employed at Bay Valley, Bolton, who is African American, was a member of the United Food & Commercial Workers International Union (the "Union") and an agreement between the Union and Bay Valley (the "Agreement") governed the terms of his employment. (ECF No. 54 ¶ 14; ECF No. 61 ¶ 14.) The Agreement provides that an employee's position in Bay Valley's Label and Pack Department is determined by his or her seniority and qualifications. (ECF No. 54 ¶ 16; ECF No. 61 ¶ 16.) An employee's date of hire determines his or her seniority, and a Union employee cannot obtain a position already occupied by another, more senior Union employee, i.e., a later hired employee cannot obtain a position currently held by an earlier hired employee. (ECF No. 54 ¶ 17; ECF No. 61 ¶ 17.) Bay Valley has a union scheduler who is responsible for assigning employees roles within the Label and Pack Department, based on their seniority and qualifications. (ECF No. 54 ¶ 18.) Although the parties agree on the terms of the Agreement, Bolton argues that Bay Valley did not always follow its requirements. (ECF No. 61 ¶¶ 16–17.)

While Bolton worked at Bay Valley, the Label and Pack Department had twenty-one workers working the following positions: front-truck lineman, labeler, label inspector, packer, pelletizer, and general relief. (ECF No. 54 ¶¶ 4–5; ECF No. 61 ¶¶ 4–5.) A Bay Valley employee, Don Medfisch, determined where new employees would be trained and the positions they would initially hold in the Label and Pack Department. (ECF No. 61 ¶ 18.) Bay Valley's policy was to train new employees in each position in the Label and Pack Department so they could fill in at other positions if necessary. (ECF No. 64-6 ¶¶ 13–17.) Bay Valley provided Bolton with at least

some training as a front-truck lineman, labeler, label inspector, and packer, but Bolton contends that Bay Valley did not complete this training. (ECF No. 54 ¶ 6; ECF No. 61 ¶ 6.)

When Bolton began at Bay Valley, he informed the company that he would prefer to work as a labeler, the most sought-after position in the Label and Pack Department. (New Matter ¶¶ 1, 4; ECF No. 70 ¶¶ 1, 4.) Although Bolton primarily worked as a packer during his time at Bay Valley, the parties disagree whether he also worked as a labeler. (ECF No. 54 ¶ 7; ECF No. 61 ¶ 7.) Bay Valley asserts that, after Bolton completed his training, he worked as both a packer and labeler. (ECF No. 54 ¶ 7.) Bolton contends that, following training, he never worked as a labeler because Bay Valley did not fully train him to work that position. (ECF No. 55-1 ¶¶ 9–17; ECF No. 64-2 ¶ 14.)

Approximately six months after Bolton began at Bay Valley, the company hired a Caucasian man named Derek DeJohn to work in the Label and Pack Department. (ECF No. 61 ¶ 6.) Shortly after his hiring, DeJohn, a less senior employee than Bolton, began to work as a labeler, although he did not request that position. (New Matter ¶¶ 5–6; ECF No. 70 ¶¶ 5–6.) Further, Patrick Parra, another Caucasian employee with less seniority than Bolton, worked general relief, which Bolton alleges was also a more desirable position than packer.[3] (ECF No. 61 ¶ 6.)

### B. Bolton Fails the Mechanical Maintenance Test

On February 11, 2015, while Bolton was still a probationary employee, he applied for a job in Bay Valley's Mechanical Maintenance Department. (ECF No. 54 ¶ 45; ECF No. 61 ¶ 45.) In order to obtain a position in the Mechanical Maintenance Department, an employee must achieve

---

[3] As of August 31, 2015, three Label and Pack employees listed general relief as their preferred position. (ECF No. 65-9 at 2.) Only one employee listed packer as his preferred position. (*Id.*)

a score of at least sixty-five percent on a written test (the "Test"). (ECF No. 54 ¶ 46; ECF No. 61 ¶ 46.) Bay Valley states that Bolton only scored sixty-two and one-half percent on the Test, but Bolton disputes this, arguing that Bay Valley never allowed him to see his actual test results. (ECF No. 54 ¶ 48; ECF No. 55-1 ¶¶ 11–14.)

Bay Valley states that if an employee asked about the information the Test covered, it would provide that employee with a scoring sheet listing the general topics tested. (ECF No. 54 ¶ 55.) However, according to Bay Valley, the scoring sheet did not contain either the Test questions or its answers. (*Id.* ¶ 56.) Bay Valley notes that when Michael Moran, an African American employee, asked about the Test, Bay Valley gave him the blank scoring sheet. (*Id.* ¶ 57.) Bolton responds that he never received a scoring sheet and Bay Valley never told him that it was available.[4] (New Matter ¶ 17.) Bolton maintains that Dan Cornish, a Caucasian employee, told him that Bay Valley had given him a pamphlet of materials to study before taking the Test. (ECF No. 61 ¶ 56.)

### C. Bay Valley's Policy on Permitting Employees to Retake the Mechanical Maintenance Test

The parties also dispute Bay Valley's procedures for employees retaking the Test. (ECF No. 54 ¶ 54; ECF No. 61 ¶ 54.) Under Bay Valley's policies, an employee who does not pass the Test must wait at least twelve months before retaking it. (ECF No. 54 ¶ 54.) The parties agree that Cornish took and failed the Test, but Bolton contends that Cornish only had to wait six months to retake it. (ECF No. 54 ¶ 51; ECF No. 61 ¶ 51.) Bolton asserts that LouAnne Dolphin,

---

[4] Whether Bolton ever asked Bay Valley about the substance of the Test is unclear.

an employee in Bay Valley's Human Resources Department, informed him that he had to wait twelve months to retake the Test, but that she told Cornish he only had to wait six months. (*Id.*)

Finally, Bay Valley contends that Vdahl Talbert, another African American employee, took and passed the Test during Bolton's time at Bay Valley and began working in the Mechanical Maintenance Department, indicating that Bay Valley did not discriminate against African Americans generally or Bolton specifically in attempting to enter the Mechanical Maintenance Department. (ECF No. 54 ¶ 52.) Further, Darrick Prior, another African American employee, passed the Test and started in the Mechanical Maintenance Department on December 1, 2015, after Bay Valley terminated Bolton, also indicating that Bay Valley had no discriminatory animus against Bolton. (*Id.* ¶ 53.) Bolton responds that he never saw Talbert in the Mechanical Maintenance Department, and that Bay Valley promoted Prior to the Mechanical Maintenance Department after firing Bolton. (ECF No. 61 ¶ 52–53.)

### D. Bolton Fails to Obtain a Position as a Forklift Driver

On June 10, 2015, Bolton bid on an internal job posting at Bay Valley for five forklift drivers in Bay Valley's Warehouse Department. (ECF No. 54 ¶ 34–35; ECF No. 61 ¶ 34–35.) Bolton was qualified to be a forklift driver, and Bay Valley gave him one of the five positions by June 17, 2015. (New Matter ¶ 19–22; ECF No. 70 ¶ 19–22.) However, Bay Valley never notified Bolton that it had given him the forklift position, Bay Valley never officially transferred him to that position, and Bolton never worked as a forklift driver for Bay Valley. (New Matter ¶¶ 24–25; ECF No. 70 ¶¶ 24–25.)

Bay Valley offers two explanations as to why Bolton never began working in the Warehouse Department. (ECF No. 54 ¶¶ 37–43.) First, Bay Valley states that, in early 2015, it was

considering combining the Label and Pack Department with the Warehouse Department; this potential merger enabled Bolton to apply for the forklift driver position. (*Id.* ¶ 37.) However, Bay Valley decided against combining the departments after the job posting closed, meaning that the employees that had applied for jobs in the Warehouse Department under the internal job posting could no longer obtain those positions. (*Id.* ¶¶ 38–39.) Accordingly, Bay Valley never transferred any of the five employees selected for the forklift driver positions to the Warehouse Department, including George Robertson, a Caucasian employee. (*Id.* ¶¶ 40–41.) Second, Bay Valley states that an employee who bids on another position within the company will not be transferred to his or her new position until the union scheduler is able to backfill his or her old position with another employee or new hire. (*Id.* ¶ 43.) Bolton never began the forklift job in the Warehouse Department because the union scheduler was unable to fill his position in the Label and Pack Department. (*Id.* ¶ 42.)

Bolton contends that Bay Valley awarded him the forklift driver position, demonstrating that it did more than consider combining the Label and Pack Department with the Warehouse Department—it took steps to do so. (ECF No. 61 ¶ 37.) Bolton notes that before Bay Valley decided against combining the Label and Pack Department with the Warehouse Department, Robertson, an employee in the Label and Pack Department, declined the position of forklift driver. (ECF No. 65-9 at 2; ECF No. 61 ¶ 41.) Bay Valley could have assigned Robertson, who was immediately ahead of Bolton on the list of five individuals to be moved into the Warehouse Department, to fill Bolton's position as a packer in the Label and Pack Department and started training Bolton to be a forklift driver. (ECF No. 61 ¶¶ 41–42.) Moreover, Bolton argues that Bay Valley had a practice of hiring a new employee to fill an old employee's position if the old

employee was moving to a new position in the company, a practice Bay Valley did not follow in this instance. (*Id.* ¶ 42.) Bolton contends that Bay Valley also has a practice of not giving an employee a new position until they are able to move the employee into that position—because Bay Valley gave Bolton the forklift driver position, it was capable of moving him to the Warehouse Department. (*Id.* ¶ 43.)

### E. Bolton's Health Issues

At some point during his tenure at Bay Valley, Bolton began experiencing pain in his feet, causing him to seek medical attention on May 9, 2015, and June 13, 2015. (New Matter ¶ 8; ECF No. 70 ¶ 8.) Bay Valley had a policy regarding employee health issues that might impact an employee's work: if a Bay Valley employee had a health problem and asked his or her supervisor for a reasonable accommodation such as plastic mats to stand on while working, the employee's supervisor was required to notify Human Resources of the request. (New Matter ¶ 10; ECF No. 70 ¶ 10.) Bay Valley then had a procedure for determining a reasonable accommodation. (New Matter ¶ 11; ECF No. 70 ¶ 11.) Bolton, however, never requested a working accommodation from Bay Valley.[5] (ECF No. 72-1 125:13–15.)

On July 24, 2015, Bolton was diagnosed with neuropathy in his feet, and on August 21, 2015, he was diagnosed with high blood pressure. (ECF No. 54 ¶¶ 101, 103; ECF No. 61 ¶¶ 101, 103.) On at least one occasion, Bolton's health issues interfered with his duties at Bay Valley; he

---

[5] The Court notes that in Bolton's affidavit, he stated that he asked his supervisor for plastic mats to use while working. (New Matter ¶ 12.) However, when a party submits an affidavit explicitly contradicting his earlier deposition testimony, the Court may disregard that affidavit and the factual dispute it creates if the affiant fails to explain the contradiction. *Jimenez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 254 (3d Cir. 2007). Because Bolton's affidavit contradicts his deposition testimony and he has not explained the contradiction, the Court will disregard Bolton's affidavit in this respect. (ECF No. 72-1:13–15.)

was at work and had to be rushed to Allegheny General Hospital when he was unable to read his machine due to neuropathy and high blood pressure. (ECF No. 54 ¶ 104; ECF No. 61 ¶ 104.) Although Bay Valley was aware that Bolton had health issues, Bolton never provided Bay Valley with medical documentation stating that he had work restrictions or could not perform his job duties as a packer. (ECF No. 54 ¶ 105; ECF No. 61 ¶ 105.) However, Bolton asserts that Bay Valley was on notice of his medical conditions because he had been rushed to the hospital from work. (ECF No. 61 ¶ 105.) Bolton told management at Bay Valley of his neuropathy sometime in the summer of 2015. (New Matter ¶ 29; ECF No. 70 ¶ 29.)

During Bolton's employment, Bay Valley had placed a chair by the labeler and packer stations for employees to sit in while they worked if necessary. (ECF No. 54 ¶ 106; ECF No. 61 ¶ 106.) Bolton stated that he did not use the chair because he did not believe that he would be able to properly perform his job as a packer while seated. (ECF No. 55-1 at 140:1–12.) Bolton also testified that, as far as he knew, he was Bay Valley's only employee that was unable to sit in the chair and work as a packer, although he did not remember seeing other employees using the chair. (ECF No. 54 ¶ 108; ECF No. 61 ¶ 108.)

### F. Bay Valley's Absenteeism and Tardiness Policy

On December 19, 2014, approximately three months after hiring Bolton, Bay Valley revised its Absenteeism and Tardiness Policy (the "Policy"); the Policy took effect on January 1, 2015. (ECF No. 54 ¶ 59; ECF No. 61 ¶ 59.) The Policy provides that employees will receive the following consequences as they accrue attendance points: at four points, a verbal warning; at six points, a written warning; at eight points, a second written warning and a one-day suspension; at ten points, a final written warning and a three-day suspension; at twelve points, termination

of employment. (ECF No. 55-4 at 2.) Each time an employee was tardy, he or she would receive one-half point; for each absence, a full point. (*Id.*) For an employee's first two medically related absences, the employee will not receive any attendance points for up to two days of work missed, provided that the employee gives Bay Valley medical documentation for the absence. (*Id.*) Upon the employee's third consecutive day missed, he or she will receive one attendance point per day absent. (*Id.*) Beginning with an employee's third medically related absence, the employee receives one attendance point for his or her first two days of work missed, provided that the employee gives Bay Valley medical documentation for the absence. (*Id.*) The employee will then receive an additional attendance point for each subsequent day that he or she is absent from work. (*Id.*)

Bolton received the Policy and understood it. (ECF No. 54 ¶ 61; ECF No. 61 ¶ 61.) Neither Bolton nor his Union ever filed a grievance regarding the Policy. (ECF No. 54 ¶ 62; ECF No. 61 ¶ 62.)

### G. Bolton Accrues Absenteeism and Tardiness Points

On April 23, 2015, Bolton received a verbal warning for accruing four points. (ECF No. 54 ¶ 68; ECF No. 61 ¶ 68.) He was tardy on January 7, 2015; March 7, 2015; March 16, 2015; and April 6, 2015. (ECF No. 55-5.) He was absent on March 12, 2015, and on April 7, 2015. (*Id.*) Bolton disputed the violation that he received for being tardy on March 7, 2015, and Bay Valley removed the half point that he received on that date from his record. (ECF No. 54 ¶ 69; ECF No. 61 ¶ 69.) However, Bolton was tardy on April 14, 2015, and therefore received another half point, for a total of four points. (ECF No. 54 ¶ 70; ECF No. 61 ¶ 70.) After his April 14 tardy, Bay Valley issued Bolton's verbal warning. (ECF No 55-5.) Bolton contends that Bay Valley improperly gave

him the first four points because it failed to accommodate his medical issues, and his absences were not due to his own misconduct. (ECF No. 61 ¶ 70.)

On May 21, 2015, Bay Valley issued Bolton a written warning for accruing six points. (ECF No. 54 ¶ 71; ECF No. 61 ¶ 71.) He was tardy on April 29, 2015, and on May 7, 2015 and absent on April 24, 2015. (ECF No. 55-6.) After his May 7, 2015, tardy, Bay Valley issued Bolton a first written warning. (*Id.*) Bolton does not dispute his fourth through sixth points.[6] (ECF No. 55-1 at 288:17–23.)

On June 15, 2015, Bay Valley issued Bolton a second written warning for accruing eight attendance points. (ECF No. 54 ¶ 73; ECF No. 61 ¶ 73.) He was tardy on May 20, 2015, and May 27, 2020 and absent on May 30, 2015. (ECF No. 55-7 at 1.) Bolton contends that he requested May 30, 2015, off, in order to attend his aunt's funeral, and that Bay Valley granted his request, meaning that he should have not received a point for that absence.[7] (ECF No. 61 ¶ 74.) Although the Policy provides that Bay Valley may issue a one-day suspension as discipline when an employee reaches eight attendance points, Bay Valley decided not to issue that suspension in Bolton's case. (ECF No. 54 ¶ 75; ECF No. 61 ¶ 75.)

Bay Valley issued Bolton a final written warning on June 15, 2015, for accruing ten attendance points. (ECF No. 54 ¶ 73; ECF No. 61 ¶ 73.) He was absent on June 3, 2015, and June 4, 2015. (ECF No. 55-7 at 2.) Bolton did not receive points for his absences on June 12, 2015, and

---

[6] Bolton concedes that his fifth and sixth points were merited, but not the first four, so he disputes the validity of Bay Valley's further disciplinary actions.

[7] The Court notes that in Bolton's deposition testimony, he stated that he did not remember whether he was given a point for attending his aunt's funeral service. (ECF No. 55-1 at 303 ¶¶ 1–9.) However, because Bolton's deposition testimony is not contradictory to his affidavit statement above, the Court takes note of Bolton's contention that he was given a point for his aunt's funeral despite Bay Valley granting his request to have the day off.

June 13, 2015, due to leg cramping because he provided a doctor's note for those absences. (ECF No. 55-1 304:2–305:11.) The Policy provides that Bay Valley may issue a three-day suspension when an employee reaches ten attendance points, but as before, Bay Valley elected not to issue that suspension in Bolton's case. (ECF No. 54 ¶ 75; ECF No. 61 ¶ 75.)

On July 25, 2015, Bolton received his eleventh point for being absent from July 23, 2015, to July 25, 2015. (ECF No. 54 ¶¶ 76, 90; ECF No. 61 ¶ 76, 90.) Bolton provided a doctor's note for his absence from July 23 to July 25, 2015, and he therefore asserts that he should not have received a point for his absence on July 25. (ECF No. 54 ¶¶ 90–91; ECF No. 61 ¶¶ 90–91.) However, the Policy states that Bay Valley employees will only be excused from work for medical reasons for two consecutive days; employees begin accruing points on the third day. (ECF No. 64-1.)

On August 4, 2015, Bay Valley held a meeting with Bolton to discuss his attendance issues. (ECF No. 54 ¶ 76; ECF No. 61 ¶ 76.) At the meeting, Bolton justified his absences on the basis of his health issues. (ECF No. 54 ¶ 77; ECF No. 61 ¶ 77.) Because his absences were medically related, Bay Valley began considering Bolton's eligibility for leave under the Family and Medical Leave Act ("FMLA") and Bay Valley's Short-Term Disability plan. (ECF No. 54 ¶ 78.) However, Bolton had worked for Bay Valley for less than a year and was ineligible for FMLA leave. (ECF No. 54 ¶ 79; ECF No. 61 ¶ 79.) Bay Valley asserts that Bolton rejected its offer for short-term disability, but Bolton stated that he never received any documentation regarding short-term disability. (ECF No. 54 ¶ 79; New Matter ¶ 30.) Finally, although Bay Valley did not provide Bolton with any physical accommodations or accommodation forms at the August 4 meeting, it states that it began the process of determining an accommodation during that meeting. (New Matter ¶¶ 31–32; ECF No. 70 ¶¶ 31–32.)

Bolton again missed work on August 21, 2015, and August 22, 2015. (ECF No. 54 ¶ 93; ECF No. 61 ¶ 93.) Bolton provided a doctor's certification for August 21 and 22, 2015, and only received a point for his absence on August 22, his twelfth under the Policy. (ECF No. 54 ¶¶ 81, 94; ECF No. 61 ¶¶ 81, 94.) Bolton testified at his deposition that the twelfth point was appropriate; because Bolton had previously taken two medically related absences—June 12 to June 13, 2015, and July 23 to July 25, 2015. (ECF No. 55-1 307:8–308:5; ECF No. 55-4 at 2.)

### H. Bay Valley Allegedly Treats Other Employees with Health Issues Better Than Bolton

While employed at Bay Valley, Derek DeJohn, a Caucasian employee, broke his ankle and could not work for eight weeks. (ECF No. 64-7 23:8–25:22.) Bolton maintains that Dolphin, a Human Resources employee at Bay Valley, told DeJohn she would stop scheduling him to work following his injury so that he would not continue to accrue attendance points, something Bay Valley never offered Bolton, despite his medical conditions. (New Matter ¶ 40.)

Bay Valley responds that DeJohn received a point for the day after his injury because he had been scheduled to work that day. (ECF No. 70 ¶ 38.) Further, DeJohn was eligible for, and received, short-term disability for the time that he missed. (ECF No. 64-7 25:4–20.) Finally, Bay Valley states that DeJohn's injury occurred after Bolton's termination[8] and rendered DeJohn completely unable to work, making DeJohn's situation distinct from Bolton's. (ECF No. 70 ¶ 40.)

---

[8] The Court notes that the parties dispute when DeJohn's injury occurred. Bolton cites one portion of DeJohn's deposition in which he testified that he was injured in October of 2016. (New Matter ¶ 38.) Bay Valley responds by citing another portion of DeJohn's deposition in which he testified that he was injured in 2017. (ECF No. 70 ¶ 38.) Regardless of whether it was 2016 or 2017, DeJohn's injured occurred after Bay Valley terminated Bolton's employment in 2015.

Bolton also alleges that Patrick Parra missed about a week of work because his sister had cancer. (ECF No. 64-2 ¶¶ 88–89.) However, Bolton contends that Bay Valley did not give Parra attendance points for those dates, indicating that it treated Parra better than him. (*Id.*)

## I. Bolton's Supervisor, Randy Trusnovic Allegedly Causes a Hostile Work Environment

Throughout Bolton's tenure at Bay Valley, he primarily worked second shift.[9] (ECF No. 54 ¶ 9; ECF No. 61 ¶ 9.) While working second shift, Bolton's supervisor was Randy Trusnovic. (ECF No. 54 ¶ 13; ECF No. 61 ¶ 13.) There is no evidence that anyone, including Trusnovic, ever directed a racial slur towards Bolton during his time at Bay Valley. However, Trusnovic did call Bolton an "asshole" on at least one occasion and a "punk" on another. (ECF No. 54 ¶¶ 20, 23–24; ECF No. 61 ¶¶ 20, 23–24.) Bolton disagrees that Trusnovic only called him an asshole, alleging that Trusnovic actually called him and another African American employee, Rodchild Clerfe, "fuckin' asshole[s]."[10] (ECF No. 61 ¶ 22.) Finally, Bolton notes that Trusnovic sent an email to other Bay Valley employees in which Trusnovic stated that Bolton had a greater number of attendance violations than he in fact did.[11] (*Id.*)

---

[9] "Second shift" generally connotes working a period from early afternoon until late night or early morning.

[10] Bolton alleges that Trusnovic said the following to him and Clerfe, "You and [Clerfe] bet [sic] get your shit together or you both are going to be on the outside looking in, you fuckin' asshole." (ECF No. 61 ¶ 22.)

[11] Trusnovic's email, which he sent on June 13, 2015, stated that Bolton had accrued sufficient points under the Policy to be subject to termination. When Trusnovic sent this email, Bolton had accrued ten points under the Policy. (ECF No. 55-7 at 2.) Therefore, if Bolton's absences on June 12 and June 13 were unexcused absences, he would have received one attendance point for each day, putting him at twelve points. (ECF No. 64-1 at 2.) However, because Bolton provided a doctor's note for those dates, he did not receive an attendance point for either absence. (ECF No. 54 ¶¶ 88–89; ECF No. 61 ¶¶ 88–89.)

**J. Bay Valley Terminates Bolton's Employment**

On September 3, 2015, Holloway, Bay Valley's Human Resources Manager, decided to terminate Bolton's employment as a result of Bolton reaching twelve points under the Policy. (ECF No. 54 ¶¶ 82; ECF No. 61 ¶¶ 82.) At the termination meeting on September 3, Bolton informed Bay Valley that some of his absences were due to medical issues. (ECF No. 54 ¶ 83; ECF No. 61 ¶ 83.) Bay Valley told Bolton that if he could provide documentation for those absences, it would reconsider its decision to discharge him. (ECF No. 54 ¶ 84; ECF No. 61 ¶ 84.) Bolton did not give Bay Valley any additional medical notes or documents to justify his absences, and Bolton's termination remained in effect. (ECF No. 54 ¶ 85; ECF No. 61 ¶ 85.)

**IV.  Procedural Background**

On April 26, 2017, Bolton filed the Complaint against Bay Valley. (ECF No. 1.) Bolton filed an Amended Complaint on June 1, 2017, alleging five claims: retaliation in violation of Title VII and the ADA, race discrimination in violation of Title VII, disability discrimination in violation of the ADA, race and disability discrimination in violation of the PHRA, and violation of the Pennsylvania Wage Payment and Collection Act ("WPCA"). (*See* ECF No. 3.) Bay Valley filed an Answer on July 31, 2017, (ECF No. 13) and moved for summary judgment on July 15, 2019. (ECF No. 52.) Bolton responded in opposition to Bay Valley's motion for summary judgment on September 23, 2019. (ECF No. 62.) The parties filed a stipulation of dismissal of Bolton's retaliation and WPCA claims on January 28, 2020, which this Court granted. (ECF No. 73–74.)

## V.  Legal Standard

This Court will grant summary judgment only "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a summary judgment motion, this Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than

a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

## VI.   Discussion

### A. Bay Valley Is Not Entitled to Summary Judgment on Bolton's Disparate Treatment Claim Because a Reasonable Jury Could Conclude that Bay Valley Discriminated Against Him on the Basis of Race

Title VII bars employers from discriminating against employees on the basis of race.  42 U.S.C. § 2000e-2(a).[12]   Bay Valley is an "employer" subject to Title VII, and Bolton was an "employee" entitled to statutory protection from race-based discrimination.  *Id.* §§ 2000e(b), (f).

Since Bolton has presented no "direct evidence" of discrimination,[13] the Supreme Court's burden-shifting framework for "indirect evidence" of *McDonnell Douglas v. Green*, forms the basis of this Court's analysis.  411 U.S. 792 (1973).  In an indirect evidence case, the employee must first establish a prima facie case of unlawful discrimination.  *Moore v. City of Phila.*, 461 F.3d 331, 342

---

[12] Bolton asserts that Bay Valley discriminated against him on the basis of his race in violation of both Title VII and the PHRA.  (ECF No. 3 at 9–12.)  Courts construe Title VII and the PHRA consistently, so this Court's analysis of Bolton's Title VII claim and his PHRA claim is identical.  *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409–10 (3d Cir. 1999).  Accordingly, if Bay Valley is entitled to summary judgment on Bolton's Title VII claim, it is likewise entitled to summary judgment on Bolton's PHRA claim.  For simplicity, the Court will only refer to Bolton's Title VII claim in its analysis.

[13] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which a plaintiff presents "direct evidence" of discrimination.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).  "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's prima facie case to shift the applicable burden of production to the defendant.  *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995).  Plaintiff concedes that the evidence in this case does not constitute "direct evidence" of discrimination.  (ECF No. 62 at 6.)

(3d Cir. 2006). If the employee establishes a prima facie case, the employer must articulate legitimate, nondiscriminatory reasons for its actions against the employee. *Id.* Once the employer provides a legitimate, nondiscriminatory reason, the employee must then demonstrate that the employer's reasons are merely pretext for unlawful discrimination. *Id.*

Bolton alleges discrimination based on both disparate treatment and a hostile work environment. In particular, Bolton alleges that the following four situations show disparate treatment on the basis of race: (1) Bay Valley's failure to properly train Bolton and his initial job assignment as a packer in the Label and Pack Department; (2) Bay Valley's refusal to transfer Bolton to the Mechanical Maintenance Department; (3) Bay Valley's failure to transfer Bolton to the forklift driver position in the Warehouse Department; and (4) Bay Valley's termination of Bolton's employment.

To establish a prima facie case of disparate treatment, Bolton must show: (1) he is a member of a protected class; (2) he was qualified for the position he sought; (3) he was subject to an adverse employment action despite being qualified; and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination.[14] *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). As the issue of whether a plaintiff has made out a prima facie case is fact-specific, the inquiry focuses on whether the circumstances giving rise to

---

[14] The specific elements of a prima facie discrimination case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size fits all basis." *Jones,* 198 F.3d at 411; *see also Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 (1977) ("The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.")

an inference of discrimination have evidentiary value, not whether they fit a rote, mechanical formula. *Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 700 (W.D. Pa. 2010).

Although an inference of race-based discrimination cannot arise solely from an employee's subjective belief that his race influenced the challenged employment action, an employee can establish a prima facie case by showing that he has received less favorable treatment than similarly situated employees who did not share his statutorily protected trait. *Id.*

The parties agree that Bolton is African American, and therefore a member of a protected class. (ECF No. 53 at 5; ECF No. 62 at 6.) Accordingly, the Court must decide whether Bolton has demonstrated that he was (1) qualified for the position he sought; (2) Bay Valley subjected him to an adverse employment action despite his qualifications; and (3) Bay Valley subjected him to an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. As Bay Valley challenges only that a reasonable jury could infer unlawful discrimination, the Court will confine its analysis to that element.

### 1. The Parties' Arguments

Bay Valley argues that Bolton cannot make out a prima facie case of racially disparate treatment because Bolton has not shown that the circumstances of his employment or discharge lead to the inference that Bay Valley treated him differently due to his race. (*Id.* at 5–7.) Bolton cannot demonstrate that Bay Valley subjected him to disparate treatment with respect to his training and position[15] because the union scheduler, who is not a Bay Valley employee, decides

---

[15] That is, Bolton is alleging that the racially disparate treatment occurred when Bay Valley trained him differently than similarly-situated Caucasian employees.

where employees work. (*Id.* at 10.) And even if Bay Valley did assign Bolton to the packer position, giving him a more difficult job is not unlawful discrimination. (*Id.*)

Bolton responds that he can establish a prima facie case of discrimination because his training and initial job assignment at Bay Valley demonstrate disparate treatment. (ECF No. 62 at 9–10.) When Bolton started at Bay Valley, he listed his preferred position as labeler, but Bay Valley never fully trained him as a labeler and so he was never able to work in his favored position while at Bay Valley. (*Id.*) In contrast, Bay Valley trained DeJohn, a Caucasian employee with less seniority than Bolton, as a labeler and allowed him to work in that position. (*Id.* at 10.) A Bay Valley employee, Don Medfisch, determined new employee training; the union scheduler only scheduled employees to work positions for which they were trained. (*Id.* at 11.) Bay Valley's decision not to train Bolton in his preferred position, but to train and employ a less senior employee in Bolton's desired position, a decision which was racially motivated, controlled Bolton's work assignments. (*Id.* at 11.)

### 2. A Reasonable Jury Could Conclude That Bay Valley Subjected Bolton to an Adverse Employment Action Under Circumstances Giving Rise to an Inference of Unlawful Discrimination

Bolton must show that Bay Valley subjected him to an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. Bolton argues that Derek DeJohn and Patrick Parra, his Caucasian colleagues, received more favorable treatment from Bay Valley than he did because they are Caucasian.

### a. A Reasonable Jury Could Conclude that Bolton Was Similarly Situated with Respect to His Training and Obtaining the Mechanical Maintenance Position, but not with Respect to Obtaining the Forklift Position or His Termination

To compare Bay Valley's treatment of Bolton to its treatment of other Bay Valley employees, Bolton must show that those employees were similarly situated to him but did not share his statutorily protected trait. Although a similarly situated employee need not be identical to the plaintiff, the other employee must be similar in "all relevant respects." *Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 525 (E.D. Pa. 2014). Relevant factors include whether the employees work in the same building, whether they have similar job responsibilities, and whether they deal with the same supervisor or decision maker. *Id.* at 526. The question of whether employees were similarly situated is generally one of fact for the jury. *Id.*

Beginning with Bolton's claim of disparate treatment connected with his training, a reasonable jury could conclude that Bolton was similarly situated to DeJohn and Parra. Both DeJohn and Parra were trained, like Bolton, in the Label and Pack Department, meaning that all three employees worked in the same building. (ECF No. 65-9 at 2.) Bolton has produced evidence to show that the alleged disparate treatment occurred during training, meaning that all three had the same "job responsibilities" at the relevant time—they were all trainees at Bay Valley. (ECF No. 64-2 ¶16.) Medfisch decided where new employees would be trained and initially work within the Label and Pack Department, meaning that Bolton, DeJohn, and Parra all answered to the same supervisor at the relevant time. (ECF No. 61 ¶ 18.) Therefore, Bolton can demonstrate that he, DeJohn, and Parra were similarly situated employees.

The Court turns to Bolton's claim of disparate treatment in connection with his application for a forklift position. Bolton concedes that no Label and Pack employee, including George Robertson, a Caucasian employee, ever began work in the Warehouse Department as a forklift driver. (ECF No. 54 ¶¶ 40–41; ECF No. 61 ¶¶ 40–41.) Although Bolton disputes Bay Valley's stated reasons for not beginning to train him, he has not produced evidence of any Label and Pack employee, let alone a Caucasian employee, who received a forklift job in the Warehouse Department and then began that position. Accordingly, no reasonable jury could conclude that Bolton was similarly situated to a Caucasian employee who received favorable treatment.

Bolton asserts that he was similarly situated to two Caucasian Bay Valley employees, Dan Cornish and Jesse Snodgrass, who took the Mechanical Maintenance Test but received preferential treatment from Bay Valley. Bolton, Snodgrass, and Cornish were all employees in the Label and Pack Department when they took the Mechanical Maintenance Test. The parties do not argue that the test was in any way different or applied different standards when each of the three took it. (ECF No. 54 ¶ 46.) A reasonable jury could conclude that Bolton was similarly situated to Snodgrass and Cornish when he took the Mechanical Maintenance Test because they worked in the same building and had similar responsibilities at the time they took the test—their shared responsibility at the time was passing the test.

Finally, Bolton argues that Bay Valley subjected him to racially disparate treatment by applying the Policy in a manner more favorable to Caucasian employees. Bolton has offered no evidence that any other employee received twelve points under the Policy and was not discharged as a result. However, Bolton argues that Bay Valley treated DeJohn and Parra, Caucasian employees in the Label and Pack Department, more favorably by not giving them

points for absences. (ECF No. 61 ¶ 21.) DeJohn missed work in either 2016 or 2017—after Bolton's termination—due to injuries and Dolphin, an employee in Bay Valley's Human Resources Department, told him that she would stop scheduling him to work so that he would not receive more attendance points; DeJohn ultimately began a two month short-term disability leave from Bay Valley. (ECF No. 64-7 at 23:8–25:21.) Parra missed several days of work because his sister had cancer and did not receive points for his absences. (ECF No. 64-2 ¶¶ 88–89.)

Bolton has not shown that DeJohn and Parra were similarly situated with respect to application of the Policy. Bolton has not produced evidence that, at the time of DeJohn's injury, DeJohn was subject to the same policies as Bolton during Bolton's absences. Dolphin's temporary removal from scheduling may have been consistent with a Bay Valley Policy not in existence when Bolton worked at Bay Valley. Further, the Policy provides that Bay Valley may authorize leave and the employee will not accrue points during that approved leave. (ECF No. 55-4 at 2.) Bay Valley may have approved both DeJohn and Parra's absences and Bolton has offered no evidence to show that this is not the case. No reasonable jury could conclude that Bolton was similarly situated to DeJohn and Parra.

### b. A Reasonable Jury Could Conclude that Bolton Received Disparate Treatment with Respect to His Training but not with Respect to the Mechanical Maintenance Position

As a reasonable jury could conclude that DeJohn, Parra, Cornish, and Snodgrass were similarly situated employees who did not share Bolton's statutorily protected trait, he must now demonstrate that Bay Valley treated him less favorably than DeJohn and Parra with respect to his training and less favorably than Cornish and Snodgrass with respect to the Test.

With regard to disparate treatment, "discriminatory assignments . . . are exactly the kind of action that Title VII was designed to prevent." *Ferrell v. Harvard Indus., Inc.*, No. 00-cv-2707, 2001 WL 1301461, at *20 (E.D. Pa. Oct. 23, 2001). Assigning an employee of one race to a difficult job while assigning multiple employees of a different race to less difficult jobs implicates the "terms, conditions, and privileges" of employment such that it demonstrates a prima facie case of disparate treatment. *Woodward v. PHB Die Casting*, No. 04-cv-141, 2005 WL 3093180, at *7–8 (W.D. Pa. Nov. 18, 2005). Although an inference of race-based discrimination cannot arise solely from an employee's subjective belief that his race influenced the challenged employment action, an employee can establish a prima facie case by showing that he has received less favorable treatment than similarly situated employees who did not share his statutorily protected trait. *Howard*, 742 F. Supp. 2d at 701–02. The analysis focuses on whether the employer treated the employee less favorably on the basis of a discriminatory criterion. *Id.*

Bolton testified that, although he listed his preferred position as labeler, Bay Valley did not allow him to complete his training in that role, training him only as a packer and initially placing him in that position. (ECF No. 64-2 ¶¶ 14–15.) In contrast, Bay Valley fully trained DeJohn as a labeler and Parra as general relief, which allowed them to work those roles. (New Matter ¶¶ 5–6; ECF No. 70 ¶¶ 5–6; ECF No. 64-2 ¶ 16.) As noted above, there is evidence that packer is a less desirable position than labeler and general relief. Labeler is the most sought-after position in the Label and Pack Department, and more employees wanted to work general relief than packer. (New Matter ¶ 4; ECF No. 70 ¶ 4; ECF No. 65-9 at 2.) Although the alleged act of discrimination occurred in Bolton's training, rather than assigning him to a specific position, because a lack of training prevented his assignment to the favored position, this allegedly

discriminatory act sufficiently implicates the terms and conditions of his employment to state a prima facie case. A reasonable jury could therefore conclude that Bay Valley prepared DeJohn and Parra to work more desirable positions than Bolton.

Viewing the facts in the light most favorable to Bolton, the Court is left with the following: Bolton, an African American, requested to work as a labeler, but Bay Valley did not fully train him as a labeler, instead training him for a more difficult job as a packer. (ECF No. 64-2 ¶¶ 14–15; ECF No. 65-9 at 2.) Bay Valley fully trained DeJohn, a Caucasian, on the more favorable labeler position, despite the fact that he did not request to be trained as a labeler. (New Matter ¶¶ 5–6; ECF No. 70 ¶¶ 5–6.) Bay Valley also trained Parra, another Caucasian employee, to work the general relief role, also a more sought-after position than packer. (ECF No. 64-2 ¶ 16; ECF No. 65-9 at 2.) From these facts, a reasonable jury could conclude that Bay Valley subjected Bolton to an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. Accordingly, Bolton has made out a prima facie case of disparate treatment.

With respect to the Mechanical Maintenance Test, Bolton argues that Snodgrass received materials to prepare for the test and that Cornish was able to retake the Test sooner than he was, contrary to Bay Valley's policy. (ECF No. 61 ¶¶ 54, 56.) Bay Valley would provide a scoring sheet about the Test to employees who asked; the test was not a study guide and it did not contain answers; it listed the topics the Test covered. (*Id.* ¶ 55; ECF No. 55 ¶ 55.) Bolton alleges only that Bay Valley provided some form of materials or "cheat sheet" to Snodgrass before Snodgrass took the Test. (ECF No. 61 ¶ 56.) Bolton provides no evidence that the materials Snodgrass received were anything other than the scoring sheet, nor does Bolton offer evidence that he asked Bay Valley about the contents of the Test, which would have led to him receiving the scoring sheet.

No reasonable jury could conclude from this evidence that Bay Valley treated Snodgrass more favorably than Bolton.

With regard to Cornish, Bolton avers, in his affidavit, that Cornish, a Caucasian employee, was told that he needed to wait only six months before retaking the test, whereas he would have to wait twelve months. (ECF No. 64-2 ¶¶ 42–46.) Dolphin graded both Cornish and Bolton's test. (*Id.* ¶¶ 43–45.) However, Bolton presents no evidence that he was actually treated differently on the basis of his race. Although Bolton alleges that he and Cornish received different messages from Dolphin regarding how long they would have to wait to retake the Test, Bolton has not shown that this actually occurred. Bolton never retook the Test nor has demonstrated that Cornish did so, let alone in six months rather than twelve. Accordingly, no reasonable jury could conclude that Bay Valley treated Cornish more favorably than Bolton.

### 3. Bay Valley has Offered Nondiscriminatory Reasons for Not Training Bolton

As Bolton has established his prima facie case, Bay Valley must now offer a legitimate, nondiscriminatory reason for its actions. *Moore*, 461 F.3d at 342. To sustain its burden, a defendant need not "persuade the court that it was actually motivated by the proffered reasons," but must raise a genuine issue of fact regarding whether it discriminated against the plaintiff. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The inquiry involves no assessment of credibility since determining whether the defendant has met its burden of production must come before assessing credibility. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). A defendant satisfies its burden of production, and rebuts the plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a

jury to find that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Id.*

Here, Bay Valley has offered evidence that it trained Bolton as a labeler, and that he worked in that role after he completed his training. (ECF No. 55-1 85:24–25, 89:7–10.) The union scheduler, not Bay Valley, determines where Label and Pack employees work within the department, so Bay Valley had no control over where Bolton worked. (ECF No. 54 ¶ 18.) Taking Bay Valley's evidence as true, Bay Valley provided Bolton with training as a labeler, enabling him to later work in that position. Any time that he spent working as a packer following his initial placement was because the union scheduler placed him in that position. A jury could conclude that Bay Valley had a legitimate, nondiscriminatory reason for Bolton working as a packer rather than a labeler.

### 4. A Reasonable Jury Could Conclude That Bay Valley's Proffered Reasons Are Pretextual

As Bay Valley has offered a legitimate, nondiscriminatory reason for Bolton's training and position in the Label and Pack Department, the burden shifts back to Bolton to show that Bay Valley's reasons are pretextual. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015). A plaintiff can establish pretext in two ways. *Id.* First, the plaintiff can point to evidence that would allow a jury to disbelieve the employer's reason for the adverse action, whether the evidence comes in the form of weaknesses, implausibilities, or inconsistencies in the employer's proffered reason. *Id.* at 644–45. Second, a plaintiff can establish pretext by pointing to evidence from which a jury could conclude that race was "more likely than not" a motivating or determinative factor in the employer's action. *Id.* at 645. Specifically, a plaintiff can show

pretext by presenting evidence that has enough probative force to allow the jury to conclude that it is more likely than not that race was a motivating or determinative factor in the adverse action. *Id.* at 645.

A plaintiff meets this burden when he or she points to evidence demonstrating: (1) the defendant previously discriminated against the plaintiff; (2) the defendant has discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated employees outside of the plaintiff's protected class more favorably. *Willis*, 808 F.3d at 645. In determining whether a plaintiff has satisfied his burden at the pretext stage, courts may consider evidence from the plaintiff's prima facie case. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008).

With respect to showing pretext by disproving the employer's proffered reasons, Bolton has offered evidence demonstrating a weakness in Bay Valley's proffered reason for Bolton's initial position in the Label and Pack Department. The union scheduler determined where employees worked in the Label and Pack Department in the long run, based on employees' seniority and qualifications. (ECF No. 54 ¶ 16–18; ECF No. 61 ¶ 16–18.) The fact that the union scheduler assigned DeJohn, a less senior employee, to work as a labeler demonstrates that there was an open labeler position that Bolton could have filled before Bay Valley hired DeJohn. (New Matter ¶¶ 5–6; ECF No. 70 ¶¶ 5–6.) The fact that the union scheduler did not place Bolton, who had requested to work as a labeler, in that open position, implies that Bolton was not qualified to fill it because Bay Valley had not fully trained him. This evidence could allow a factfinder to disbelieve Bay Valley's contention that it fully trained Bolton and that any time he spent working as a packer was only because the union scheduler determined where employees worked.

With respect to showing pretext by proving that race was a motivating factor, as explained above, a reasonable jury could believe that Bay Valley treated two similarly situated employees outside of Bolton's statutorily protected class, DeJohn and Parra, more favorably in terms of their training and initial work assignment. *See supra* Section VI.A.1.d. This could allow a factfinder to conclude, by a preponderance of the evidence, that race was a determinative factor in Bay Valley's actions.

Whether Bay Valley fully trained Bolton as a labeler is a disputed question of material fact for the factfinder and, accordingly, the Court denies Bay Valley's motion for summary judgment on Bolton's race discrimination claim.

### B. No Reasonable Jury Could Conclude that Bolton Suffered a Hostile Work Environment

To establish a prima facie case of a hostile work environment, Bolton must demonstrate that (1) he suffered intentional discrimination because of his race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) respondeat superior liability existed. *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017). Bay Valley argues that Bolton cannot establish any of the first four elements. (ECF No. 53 at 10.)

### 1. The Parties' Arguments

Bolton's hostile work environment claim stems from his interactions with Trusnovic. Bay Valley concedes that Trusnovic called Bolton an "asshole" on one occasion and a "punk" on another occasion. (*Id.* at 11.) However, Bay Valley argues that Trusnovic's comments do not rise to the level of severe or pervasive harassment necessary for a hostile work environment claim to survive. (*Id.*) Bolton responds that Trusnovic actually called him and another African American

employee a "fuckin' asshole," and sent an email in which he stated that Bolton had more attendance points than he actually did. (ECF No. 62 at 11–12.)

### 2. Bolton Cannot Make Out a Prima Facie Case of a Hostile Work Environment Because He Cannot Show That He Suffered Severe or Pervasive Harassment

Courts apply a totality of the circumstance inquiry to determine whether a work environment is hostile, looking at the discriminatory conduct's frequency and severity, its humiliating or physically threatening nature, whether it is merely an "offensive utterance," and whether it "unreasonably interferes" with the employee's performance. *Castleberry*, 863 F.3d at 264. Neither "mere utterance" of an epithet engendering offensive feelings, nor "discourtesy or rudeness" violates Title VII, unless the conduct is so severe or pervasive as to "constitute an objective change in the conditions of employment." *Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 354 (3d Cir. 2010).

A supervisor's use of profanity, specifically, variations of "fuck" on multiple occasions is not severe or pervasive conduct sufficient to create a hostile work environment. *Bumbarger v. New Enterprise Stone and Lime Co.*, 170 F. Supp. 3d 801, 831–32 (W.D. Pa. 2016); *see also Exantus*, 386 F. App'x at 354 (concluding that supervisor's reference to the plaintiff as a "Haitian Fuck" was not sufficiently severe or pervasive to support a hostile work environment claim); *Fred v. Pa. Dep't of Trans.*, No. 3:12-cv-2480, 2015 WL 3875911, at *2–3, 12–13 (M.D. Pa. June 23, 2015) (noting that the plaintiff's allegations that he was called "a fucking spic" and "a fucking asshole" were not sufficiently severe or pervasive). Although more than a single act is usually required, one isolated act of discrimination, if sufficiently extreme, can create a hostile work environment.

*Castleberry*, 863 F.3d at 264–65 (holding that a supervisor's use of the "n-word" was sufficiently severe to create a hostile work environment).

Here, Bolton testified that Trusnovic called him and Clerfe, another African American employee, "Fuckin' asshole[s]" on one occasion and "punk[s]" on another. Although these statements, if made by Trusnovic, are certainly inappropriate, they do not rise to the level of severe or pervasive harassment. Unlike the incident in *Castleberry*, Trusnovic's statements did not relate to Bolton's race. Trusnovic's statements are much more akin to the profanities in *Bumbarger* and *Fred* that are not actionable under Title VII. Moreover, Trusnovic's statements do not indicate that he was physically threatening Bolton, and Bolton offers no evidence that Trusnovic's comments interfered with his work performance.

Further, Trusnovic's email contained no language that was threatening, severe, or interfered with Bolton's work performance. Trusnovic stated that Bolton's absences on June 12, 2015, and June 13, 2015, resulted in Bolton reaching twelve points under the Policy, which would have been the case if Bay Valley had not excused Bolton's absences for those dates because he provided a doctor's note. The fact that Bay Valley excused Bolton's absences on June 12 and June 13 shows that Trusnovic's comments did not lead to an objective change in the conditions of Bolton's employment. Taking all of these incidents together, Bolton has not demonstrated that Trusnovic's comments and actions were severe or pervasive, and he cannot establish a claim for a hostile work environment.

Accordingly, the Court grants Bay Valley's Motion to the extent that it seeks summary judgment on Bolton's claims relating to a hostile work environment based on race.

## C. No reasonable Jury Could Conclude that Bay Valley Terminated Bolton Because of His Alleged Disability

Bolton contends that Bay Valley unlawfully terminated his employment due to his disability, and further contends that Bay Valley failed to provide him with a reasonable accommodation. The Court will first address Bolton's claim that Bay Valley unlawfully terminated his employment before addressing arguments regarding a reasonable accommodation.

The ADA bars termination of employment on the basis of disability status.[16] 42 U.S.C. § 12112(a). The same *McDonnell Douglas* burden-shifting framework that governs Title VII claims also applies to ADA wrongful termination claims.[17] *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

### 1. Bolton Has Not Established a Prima Facie Case of Disability Discrimination

To show a prima facie case of disability discrimination, Bolton must establish that he: (1) has a disability or record of disability or was perceived as disabled by Bay Valley; (2) was qualified for the position; and (3) suffered an "adverse employment action" due to his disability, i.e., that there is a causal connection between a disability and an adverse employment action. *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir. 2002). Here, Bolton alleges that the adverse action was his termination.

---

[16] Similar to Title VII, Courts apply identical standards to ADA and PHRA disability discrimination claims. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *Wilson v. Iron Tiger Logistics, Inc.*, 628 F. App'x 832, 835–36 (3d Cir. 2015). Accordingly, if Bay Valley is entitled to summary judgment on Bolton's ADA claim, it is likewise entitled to summary judgment on his PHRA claim.

[17] As with race discrimination claims, the same framework that governs this Court's analysis of ADA claims also applies to the PHRA. *Wilson v. Iron Tiger Logistics, Inc.*, 628 F. App'x 832, 835–36 (3d Cir. 2015). Therefore, the Court will refer to Bolton's ADA claims for the sake of simplicity.

Bay Valley argues that Bolton cannot establish that he was "disabled" under the ADA and that Bolton cannot show that he suffered any adverse action as a result of his disability. (ECF No. 53 at 13.) Bolton asserts that his neuropathy, gout, and high blood pressure rendered him disabled under the ADA. (ECF No. 61 ¶¶ 10, 77, 103.) Even assuming that Bolton can establish that these conditions rendered him disabled under the ADA, he cannot show a casual connection between such a disability and his termination. Accordingly, the Court need not address whether Bolton was disabled.

### a. The Parties' Arguments

Bay Valley contends that Bolton cannot establish that his termination was due to his disability because there is no causal connection between the two. (*Id.* at 15.) No one at Bay Valley ever made comments to Bolton about his conditions interfering with his work or told him that he was terminated because of those conditions. (*Id.*)

Bolton responds that his inability to work effectively due to his medical condition led to his termination. (ECF No. 62 at 7.) Bay Valley's refusal to accommodate his condition, lack of information regarding disability leave options, unwillingness to transfer Bolton to another department, and increase of his overtime prior to termination all demonstrate a connection between his disability and his termination. (*Id.* at 7–8.)

### b. Bolton Cannot Show that Bay Valley Terminated Him Because of His Alleged Disability

There are two methods of establishing a causal connection under the ADA: (1) where the alleged disability and the adverse employment action occur in such close temporal proximity as to be "unusually suggestive," the plaintiff need not bring forth any other evidence of discrimination; or (2) where, when the temporal proximity is not "unusually suggestive," there

is other evidence of discrimination or a "pattern of antagonism." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997); *Quick v. Geo Grp.*, No. 3:18-cv-93, 2020 WL 532343, at *17 (W.D. Pa. 2020).

Bolton has offered no evidence that would connect his termination with any disability status he may have had. Bolton has not shown any evidence that would demonstrate that the temporal proximity between his termination and his medical issues is "usually suggestive." Nor has he provided other evidence of a pattern of discrimination. Although Bolton alleges that Bay Valley improperly gave him attendance points for medical absences, he has failed to show that these points were awarded because of his disability rather than the simple fact that he was either absent from, or late to, work. (*See* ECF No. 61 ¶ 70.)

Bolton has not shown that Bay Valley treated him differently than nondisabled employees who reached twelve attendance points or pointed to nondisabled Bay Valley employees who reached twelve points and retained their positions, nor has he produced evidence of comments directed at him related to his medical conditions or statements that he was terminated because of those same conditions. Nor has Bolton shown that Bay Valley treated any disability he may have had differently than those of other employees—Bolton agrees that Bay Valley gave points to employees who missed work due to medical reasons, as DeJohn received a point for his absence the day he became injured. (*Id.* ¶ 21.)

As Bolton has not produced evidence from which a reasonable jury could conclude that there is a causal connection between his termination and alleged disability status, his claim fails. Accordingly, the Court grants Bay Valley's Motion to the extent that it seeks summary judgment on Bolton's claim that he was wrongfully terminated on the basis of disability.

### 2. Bay Valley Has Offered a Legitimate, Nondiscriminatory Reason for Terminating Bolton's Employment

Although the Court holds that Bolton cannot establish his prima facie case, the Court will briefly continue to address the remaining elements of his claim. Once a plaintiff establishes his prima facie case, the defendant shoulders the burden of production and must offer a legitimate, nondiscriminatory reason for its actions. *Anderson v. Wachovia Mortg. Corp.* 621 F.3d 261, 271 (3d Cir. 2010). The defendant satisfies this burden by introducing evidence that would permit a reasonable jury to conclude that it had legitimate, nondiscriminatory reasons for those actions. *Id.* Repeated violations of progressive discipline policies, where the violations have risen to the level of termination, can be legitimate, nondiscriminatory reasons for termination. *See e.g., Munoz v. Nutrisystem, Inc.*, No. 13-cv-4416, 2014 WL 3765498, at *5 (E.D. Pa. 2014); *Straka v. Comcast Cable*, 897 F. Supp. 2d 346, 357–58 (W.D. Pa. 2012); *Veltri v. Thompson Consumer Electronics*, No. 2-cv-645, 2004 WL 1490522, at *5 (M.D. Pa. 2004).

Here, Bay Valley states that it fired Bolton because he reached twelve attendance points. (ECF No. 54 ¶ 82.) Under the Policy, if an employee accrued twelve attendance points, he or she was subject to termination. (ECF No. 54 ¶ 82; ECF No. 55-4 at 2.) A reasonable jury could conclude that this is the case. Accordingly, as Bay Valley has offered evidence that it terminated Bolton for violating the Policy, it has articulated a nondiscriminatory basis for its actions.

### 3. Bolton Cannot Demonstrate That Bay Valley's Reasons for Terminating His Employment Were Pretextual

Once the employer has articulated a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to show that that reason is pretextual. *Moore*, 461 F.3d at 342. A plaintiff can establish pretext in two ways: (1) by pointing to evidence that would allow

a factfinder to disbelieve the employer's reason for the adverse action—the evidence can come in the form of weaknesses, implausibilities, or inconsistencies in the employer's proffered reason; (2) by pointing to evidence that would allow a factfinder to conclude that an invidious discriminatory reason was "more likely than not a motivating or determinative cause" of the employer's action. *Willis*, 808 F.3d at 644–45. Specifically, a plaintiff can show pretext by presenting evidence that is sufficiently probative to permit a jury to determine that the plaintiff's disability was a motivating or determinative factor in the termination. *Id.* A plaintiff meets his burden to show pretext when he or she produces evidence from which a reasonable jury could conclude that: (1) the defendant previously discriminated against the plaintiff; (2) the defendant has discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated employees outside of the plaintiff's protected class more favorably, the plaintiff has met his burden to show pretext. *Id.*

### a. The Parties' Arguments

With respect to showing pretext through disbelief of an employer's proffered reason, Bolton makes several arguments: (1) Bay Valley improperly awarded him points for absences under the Policy, including when he attended his aunt's funeral on May 30, 2015, and when he had medical excuses on July 25, 2015, and August 22, 2015; (2) Bay Valley issued him his Second Written Warning and Final Written Warning on the same day, contrary to the Policy's "progressive" discipline; (3) Bay Valley did not issue him suspensions for his Second and Final Written Warnings, actions that the Policy prescribed, indicating that Bay Valley arbitrarily enforced the Policy; and, (4) Bay Valley increased his overtime after his hospital visit in late July of 2015. (ECF No. 62 at 17–23.)

With respect to showing pretext through evidence of discrimination, Bolton argues that Bay Valley applied the Policy differently in Bolton's case than it did in the case of Derek DeJohn and Patrick Parra and that a jury could conclude from this differential application that Bay Valley discriminated against him. (*Id.* at 23–24.)

Bay Valley responds that Bolton cannot show that its reason for firing him—extensive violations of the Policy—are pretextual. (ECF No. 532 at 16.) No one told Bolton that Bay Valley was terminating him because of his alleged disability or made negative remarks about his medical issues. (*Id.*) Bolton was aware of the consequences for repeated violations of the Policy and underwent its escalating process of discipline as he accrued absence points. (*Id.*) Bolton's speculation that Bay Valley fired him because of his medical conditions, alone, is insufficient to permit a jury to conclude that his termination was pretextual. (*Id.*)

### b. Bolton Has Not Provided Evidence from Which a Reasonable Jury Could Disbelieve Bay Valley's Legitimate, Nondiscriminatory Reasons for Terminating Him

At the pretext stage, it is not enough for an employee to show that his employer was "wrong or mistaken;" an employee must demonstrate his employer acted with "discriminatory animus." *Fuentes*, 32 F.3d at 765. The ADA provides a remedy for discriminatory employment decisions, it does not provide an avenue for addressing unfair or unwarranted employment decisions. *Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 446 (E.D. Pa. 2014). For instance, an employee's disagreement with an employer's disciplinary actions for attendance violations is insufficient to show that termination for those same attendance violations was pretextual. *Id.*

Bolton argues that Bay Valley improperly gave him points under the Policy. (ECF No. 62 at 18–20.) Bay Valley approved his request to attend his aunt's funeral on May 30, 2015, but Bay

Valley still gave him a point for missing work on that date. (ECF No. 55-1 at 302:25–303:12; ECF No. 65-5 at 2; ECF No. 55-7 at 1.) Bolton also asserts that he should not have received points for his absences on July 25, 2015, or August 22, 2015, because he provided Bay Valley with doctor's excuses for both dates and the Policy precludes awarding points when absences occur for valid medical reasons. (ECF No. 64-8; ECF No. 64-9.)

If Bay Valley granted Bolton's request for a day off to attend his aunt's funeral on May 30, 2015, and then still gave him a point for that day, a fact that is disputed, this point would be unfair, but Bolton has not shown that it was connected in any way to his alleged disability status. The fairness of that particular point is in question but has no bearing on a claim for disability discrimination as it does not show that Bay Valley acted with discriminatory animus. Accordingly, it would not permit a jury to disbelieve Bay Valley's reason for terminating Bolton's employment.

Bolton's points for his absences on July 25, 2015, and August 22, 2015 were given in a manner consistent with the Policy. The Policy permits employees to have two medically-related, documented excuses per year, and each absence can last for two days before points accrue. (ECF No. 55-4 at 2.) An employee will begin receiving one attendance point per day upon the third consecutive workday missed, even if the employee provides medical documentation. After the employee uses the two authorized medical absences, each additional absence, even if medically justified, results in a point per day absent, although the first two days count as only one point. (*Id.*)

Bolton's first authorized medical absence occurred when he missed work on June 12, 2015, and June 13, 2015, and Bay Valley excused those absences. (ECF No. 55-1 at 304:2–305:6.) Bolton's

second authorized medical absence occurred on July 23, 2015, and July 24, 2015. (ECF No. 55-1 at 305:7–11.) However, as Bolton also missed July 25, 2015, the Policy authorized Bay Valley to give him a point for that day, his third day absent. Because Bolton's absence from July 23-25, 2015, constituted his second—and final—authorized medical absence, his absence of August 21-22, 2015, was unauthorized and Bay Valley properly gave him a point for August 22, 2015,[18] his twelfth, which merited termination under the Policy. (ECF No. 54 ¶ 94; ECF No. 61 ¶ 94; ECF No. 55-4 at 2.)

Bolton has produced no evidence that Bay Valley's actions in giving Bolton points for his July 25, 2015, absence and his August 22, 2015, absence were inconsistent with the Policy and issued because of his alleged disability. Bolton's evidence in this respect is a simple disagreement with the Policy and its execution, which is not enough to permit a factfinder to determine that Bay Valley's reason was pretextual. *Mercer*, 608 F. App'x at 65.

Bolton's next argument that Bay Valley's reason for terminating his employment is pretextual is that Bay Valley issued him his Second and Final Written Warning on the same day— June 15, 2015—contrary to the Policy's "progressive" discipline. (ECF No. 55-7 at 1–2.) However, Bolton provides no further evidence as to how Bay Valley issuing him two warnings on the same day is evidence of discriminatory intent, such as evidence that it acted differently with respect to other employees. The Court notes that Bolton reached eight attendance points, and therefore reached the threshold for a Second Written Warning, on May 30, 2015, and ten points, the threshold for a Final Written Warning, five days later, on June 4, 2015. (ECF No. 54 ¶¶ 73–75;

---

[18] Bay Valley did not give Bolton a point for his absence of August 21, 2015, because he produced a doctor's note.

ECF No. 55-7 at 1–2.)  Bolton has produced no evidence to show that Bay Valley issued both warnings at the same time out of discriminatory animus rather than because Bolton reached the two thresholds in quick succession.  The simple fact that Bay Valley provided Bolton with two notices on the same day is not a reason for the factfinder to disbelieve Bay Valley.

Third, Bolton asserts that Bay Valley's reason is pretextual because the Policy called for Bay Valley to suspend employees for one day upon reaching eight attendance points and three days upon reaching ten, but Bay Valley did not suspend Bolton at either stage, indicating that Bay Valley enforced the Policy arbitrarily.  (ECF No. 55-1 at 290; ECF No. 62 at 17.)  Although the Policy states that the Second and Final Written Warnings include a suspension, Bolton has produced no evidence to show that Bay Valley's decision not to impose suspensions on him was in any way motivated by his alleged disability status; indeed, the decision not to impose the suspensions benefited Bolton by permitting him to continue working.  Accordingly, the Court holds that this evidence is also an insufficient basis for a jury to disbelieve Bay Valley's proffered reason for terminating Bolton.

Fourth, Bolton contends that the factfinder could disbelieve Bay Valley's reason for its actions because Bay Valley increased his overtime after his hospital visit in late July 2015.  (ECF No. 65-6 at 2.)  Bolton's overtime increased progressively from July into August: he worked 9.0 hours of overtime for the pay period ending on July 17, 2015; he worked 21.5 hours of overtime for the pay period ending on July 31, 2015; he worked 34.5 hours of overtime for the pay period ending on August 14, 2015; and he worked 39.0 hours of overtime for the pay period ending on August 28, 2015.  (*Id.*)  Although Bolton worked more overtime in August 2015 than he did in July 2015, he has produced no evidence to connect this increase to his alleged disability status,

and he does not provide evidence of the overtime he worked in other months. Accordingly, a reasonable jury could not use the difference in overtime Bolton worked between July and August 2015 to disbelieve Bay Valley's reason for terminating him.

### c. Bolton Has Not Provided Evidence from Which a Reasonable Jury Could Conclude That Bay Valley Treated Similarly Situated Employees More Favorably

In order to show pretext through evidence of discriminatory intent, Bolton must establish that DeJohn and Parra were similarly situated employees outside of his protected class whom Bay Valley treated more favorably. *Willis*, 808 F.3d at 645. Employees are similarly situated if they: (1) deal with the same supervisor; (2) are subject to the same standards; and (3) engage in the same conduct, without differentiating or mitigating circumstances that would distinguish their employer's treatment. *Opastnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009).

Bolton argues that Bay Valley's preferential treatment of Derek DeJohn and Patrick Parra shows Bay Valley's discriminatory intent. (ECF No. 62 at 22–23.) While employed at Bay Valley, DeJohn broke his ankle and could not work for eight weeks. (ECF No. 64-7 at 23:8–25:21.) Bolton maintains that LouAnne Dolphin, a Human Resources employee at Bay Valley, told DeJohn she would stop scheduling him following his injury so that he would not continue to accrue attendance points, an offer Bay Valley never made Bolton, despite his medical conditions. (New Matter ¶ 40.) Bolton also alleges that when Patrick Parra missed a week of work because his sister had cancer, Bay Valley did not give Parra points for his absences during that week. (ECF No. 64-2 ¶¶ 88–89.) (*Id.*)

DeJohn's injury occurred in either October 2016 or October 2017, either one or two years after Bay Valley terminated Bolton. (New Matter ¶ 38; ECF No. 70 ¶ 38.) DeJohn testified that,

on the day of his injury, Dolphin told him he would have to take a point for his absence that day, but that she would take him off the schedule for a day or two so that he would not receive points until he saw a doctor. (ECF No. 64-7 at 24:3–12.) DeJohn ultimately went on short-term disability for eight weeks. (*Id.* at 24:13–22.)

Bolton has not produced evidence to show that he and DeJohn had the same supervisor or were subject to the same standards at the time of their respective medical issues. For example, when Dolphin took DeJohn off the schedule for a day or two, that action could have been completely consistent with a Bay Valley policy that was not operative during Bolton's employment, but Bolton bears the burden to produce such evidence and he has failed to do so. Because Bolton has not shown that he and DeJohn were subject to the same supervisor or standards, DeJohn is not a similarly situated employee and a reasonable jury could not use Bay Valley's treatment of DeJohn to conclude that Bay Valley discriminated against Bolton.

Bolton alleges that when Parra missed a few days of work due to his sister having cancer, he received no points for his absences. (ECF No. 64-2 ¶¶ 14–15.) Even assuming that Bolton and Parra had the same supervisor at this time, the evidence that Bolton offers is insufficient to show that he and Parra engaged in the same conduct—unauthorized absences from work. The Policy states that authorized absences do not result in points and include a "company approved leave of absence." (ECF No. 55-4 at 2.) Authorized absences also include up to two medical absences, which Bolton utilized for his June 12–13, 2015 and July 23–24, 2015, absences. (ECF No. 55-1 at 304:2–305:11.) Bolton bears the burden to show disparate treatment, which here requires showing that Parra's absences were unauthorized; he has failed to do so. As Bolton has not shown that he and Parra engaged in the same conduct, Parra is not a similarly situated employee.

Asa Bolton has identified no similarly situated employees, no reasonable jury could conclude that Bay Valley's nondiscriminatory reason for terminating Bolton's employment—his accrual of twelve points under the Policy—was pretext for unlawful discrimination.

Bolton cannot show pretext and the Court accordingly grants Bay Valley's Motion to the extent it seeks summary judgment on Bolton's claim that he was wrongfully terminated n violation of the ADA.

### D. No Reasonable Jury Could Conclude that Bay Valley Failed to Accommodate Bolton's Alleged Disability

Turning to Bolton's claim that Bay Valley failed to provide him with a reasonable accommodation for his disability, an employer discriminates against an employee on the basis of disability when the employer fails to reasonably accommodate an otherwise qualified employee's "known physical or mental limitations," unless the employer can show that providing that accommodation "would impose an undue hardship on the operation of [its] business."  42 U.S.C.A. § 12112 (b)(5)(A).

In order for an employer to be liable for a failure to accommodate, an employee must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) his employer failed to make a reasonable accommodation. *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 186 (3d Cir. 2009).  An employee can demonstrate that his employer breached its duty to provide a reasonable accommodation by showing that: (1) the employer knew of the disability; (2) the employee requested accommodations or assistance for the disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the

employee could have been reasonably accommodated but for the employer's lack of good faith. *Id.* at 187. This is known as the "interactive process" for determining a reasonable accommodation.

Although the ADA itself does not mention an "interactive process" with respect to reasonable accommodations, the ADA's regulations provide that determining an appropriate and reasonable accommodation may involve an informal, interactive process with the employee. 29 C.F.R. § 1630.2(o)(3). The process should look to what the employee's limitations are and what accommodations may overcome those limits. *Id.* Both the employer and employee have a duty to participate in the process of finding a reasonable accommodation and to act in good faith in so doing. *Hohider*, 574 F.3d at 187.

The *McDonnell Douglas* burden-shifting framework does not govern failure to accommodate claims, and an employee need not demonstrate that the employer acted with discriminatory animus in order to establish a claim. *Bielich v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 617 (W.D. Pa. 2014).

As explained above, the parties disagree over whether Bolton was disabled within the meaning of the ADA. *See Supra* V.C.1. Because the parties disagree over whether Bolton was disabled, they also disagree over whether Bay Valley was aware of Bolton's disability. (ECF No. 53 at 17; ECF No. 61 ¶ 10.) Even assuming that Bolton was disabled, and Bay Valley was aware of that disability, Bolton cannot establish that Bay Valley failed to engage in the interactive process in good faith. Accordingly, the Court need not resolve the issue of Bolton's disability.

## 1. The Parties' Arguments

Bay Valley argues that it made a good faith effort to assist Bolton by offering him a number of accommodations. (ECF No. 53 at 18.) For example, Bay Valley provided Bolton with a chair to sit in while operating the packer, which would have enabled him sit while working, rather than remain on his feet. (*Id.*) Bay Valley also excused several of Bolton's health related absences, and it offered him an extended period of leave when he revealed the problems he was having with his feet. (*Id.*) Finally, Bolton's request for a transfer to a different position did not constitute a request for a reasonable accommodation because he has not shown that there were open positions at Bay Valley for which he was qualified and to which Bay Valley could have transferred him. (*Id.* at 19.)

Bolton responds that Bay Valley failed to make a good faith effort to assist him because Bay Valley (1) did not provide him with plastic mats to stand on while he worked; (2) did not transfer him to another position; and (3) did not give him an extended leave of absence. (ECF No. 62 at 4, 11, 25.)

## 2. A Reasonable Jury Could Conclude that Bolton Requested Accommodations for His Alleged Disability

An employee need not invoke "magic words" to request a reasonable accommodation for an alleged siability. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 507–08 (3d Cir. 2010). Once the employer knows of the employee's disability and desire for accommodation, the employer then has the burden, and must request additional information from the employee to determine whether a reasonable accommodation is available. *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 247 (3d Cir. 2006).

Here, Bolton never requested a specific working accommodation from Bay Valley. (ECF No. 72-1 at 125:13–15.) However, Bolton did tell Bay Valley about the pain in his feet and his neuropathy at the August 4, 2015, meeting, and Bolton advised LouAnne Dolphin of his foot pain prior to that meeting. (New Matter ¶¶ 28–29; ECF No. 70 ¶¶ 28–29.) Bay Valley began the "interactive process" to find a reasonable accommodation with Bolton during the August 4, 2015, meeting. (ECF No. 70 ¶ 31.) Therefore, Bay Valley was on notice of Bolton's foot pain and neuropathy and his desire for an accommodation in late July or early August of 2015. Accordingly, a reasonable jury could conclude that Bolton requested an accommodation.

### 3. No Reasonable Jury Could Conclude that Bay Valley Failed to Engage in the Interactive Process in Good Faith

As noted above, Bolton advances three arguments supporting his claim that Bay Valley failed to provide a reasonable accommodation: (1) Bay Valley failed to make a good faith effort to assist him in finding a reasonable accommodation because Bay Valley did not provide him with plastic mats to stand on while he worked (ECF No. 62 at 25); (2) Bay Valley failed to engage in the interactive process in good faith because it did not transfer him to a new position after he told Bay Valley of his foot pain and neuropathy (*Id.* at 11); and (3) Bay Valley failed to act in good faith during the interactive process because it did not give him an extended leave of absence. (*Id.* at 4.) The Court will address each in turn.

### a. Bay Valley's Failure to Provide Plastic Mats for Bolton Did Not Breach Its Duty to Act in Good Faith to Provide Bolton a Reasonable Accommodation

Both the employer and employee have a duty to assist in the search for a reasonable accommodation and to act in good faith. *Hohider*, 574 F.3d at 187. A reasonable accommodation may include a modification or adjustment in the work environment, or how the job is performed,

that permits the employee to perform the essential functions of the position. 29 C.F.R. § 1630.2(o)(1). Although the employer must act in good faith, it need not provide the specific accommodation that an employee requests—rather, it need only provide some reasonable accommodation. *Yovtcheva v. City of Phila. Water Dep't*, 518 F. App'x 116, 122, 124 (3d Cir. 2013). For example, in *Yovtcheva*, where an employer provided an accommodation that would have addressed the employee's disability, but the employee never took advantage of the accommodation, the employer did not violate the ADA. *Id.* An employee who fails to consider a reasonable accommodation that the employer offers but who does not explain why that accommodation fails to address his disabilities, cannot sustain a claim against his employer for failing to act in good faith. *Hofacker v. Wells Fargo Nat'l Bank Ass'n*, 179 F. Supp. 3d 463, 471–72 (E.D. Pa. 2016).

Here, after Bay Valley became aware of Bolton's foot pain and neuropathy in late July or early August, it discussed FMLA leave with him at the August 4, 2015, meeting, and, at the September 3, 2015, meeting, it offered to reconsider its decision to terminate his employment if he provided additional medical documentation for his absences, but Bolton never provided any such documentation. (ECF No. 54 ¶¶ 78–79, 81; ECF No. 61 ¶¶ 78–79, 81.) These actions tend to demonstrate Bay Valley's good faith engagement in the interactive process. During Bolton's employment, Bay Valley provided a chair in which packers could sit while working the packing machine. (ECF No. 54 ¶ 106; ECF No. 61 ¶ 106.) Bolton did not use the chair because he could not sit and still operate the machine. (ECF No. 55-1 at 140:4–7.) However, the employee that trained Bolton was able to sit in the chair while working as a packer, and Bolton was unable to name any other employees that could not sit in the chair while working. (*Id.* at 141:4–24.)

No reasonable jury could conclude that Bay Valley failed to, in good faith, engage Bolton in an interactive process to find a reasonable accommodation for his alleged disability. The chair that Bay Valley provided Bolton directly addressed his foot pain due to standing on a concrete floor for long hours by providing him the opportunity to sit down while he worked. (ECF No. 64-2 ¶ 24.) Bolton provides no evidence, including medical documentation, showing that the chair failed to adequately address his disability. Bolton's own statement that another Bay Valley employee sat in the chair while working the packer demonstrates that it was possible to do so. Although a reasonable accommodation for one employee may not necessarily be one for all employees, Bolton has produced no evidence that Bay Valley was unaware that the chair did not alleviate his discomfort and accommodate his disability. Bay Valley did not fail to engage in the interactive process in good faith simply because it did not give Bolton the specific accommodation he wanted—here, plastic mats upon which he could stand. *Yovtcheva*, 518 F. App'x at 122. Bolton cannot bring a claim against Bay Valley for failing to act in good faith by not providing him with plastic mats when he failed to use the reasonable accommodation that Bay Valley provided—the chair. *Hofacker*, 179 F. Supp. 3d at 471–72.

Further, a reasonable accommodation offered prior to the employer becoming aware of the full extent of the employee's disability does not cease to be a reasonable accommodation once the employer becomes aware of the extent of the disability. *Solomon v. Sch. Dist. of Phila.*, 532 F. App'x 154, 158 (3d Cir. 2013). Therefore, regardless of whether Bay Valley provided Bolton with the chair before or after it became aware of the pain and neuropathy he was experiencing, the chair still constituted a reasonable accommodation.

### b. Bay Valley's Failure to Transfer Bolton Was Not a Violation of Its Duty to Act in Good Faith

In cases alleging a failure to reasonably accommodate by failing to transfer the disabled employee to a different position, if the record does not establish the existence of a position to which the employer could have transferred the employee, the Court must grant summary judgment for the employer. *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000). The employee bears the burden of demonstrating the existence of a reasonable accommodation that would render him qualified. *Gardner v. Sch. Dist. of Phila.*, 636 F.App'x 79, 83–84 (3d Cir. 2015).

Here, Bolton has offered no evidence of an open position in the Label and Pack Department in late July or early August 2015. Bolton agrees that none of the employees that Bay Valley selected for the forklift position transferred into those roles over the summer of 2015, and he offers no evidence of open forklift positions when he requested an accommodation from Bay Valley. (ECF No. 54 ¶ 40; ECF No. 61 ¶ 40.) Finally, Bolton has not demonstrated that there were any open positions in the Mechanical Maintenance Department at Bay Valley for which he was qualified. As Bolton has offered no evidence establishing the existence of an appropriate position into which Bay Valley could have transferred him, no reasonable jury could conclude that Bay Valley failed to act in good faith when it did not transfer him to a new position.

### c. Bay Valley Did Not Breach Its Duty of Good Faith by not Granting Bolton an Extended Leave of Absence

If an employee shows that it would be temporary and permit him to perform his essential job functions in the near future, a leave of absence may be a reasonable accommodation. *Gardner*, 636 F. App'x at 84. However, the employee must provide evidence regarding the length of the requested leave and that shows that leave would enable him to return to work and perform the

49

essential functions of his job within a reasonable period; absent this evidence, leave is not a reasonable accommodation. *Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 585–86 (3d Cir. 2004).

Here, Bolton simply states that Bay Valley should have given him time off of work. Because he offers no evidence as to the duration of the leave that he was requesting or evidence indicating that a leave would have enabled him to return to work and perform the essential functions of his job in a reasonable amount of time, no reasonable jury could conclude that Bay Valley failed to act in good faith when it did not give Bolton a leave of absence.

No reasonable jury could conclude that Bay Valley failed to engage in the interactive reasonable accommodation process in good faith; therefore, Bolton has not shown that Bay Valley failed to accommodate his alleged disability, and the Court grants Bay Valley's motion for summary judgment with respect to Bolton's disability discrimination claim.

## VII.    Conclusion

For the forgoing reasons, the Court denies Bay Valley's Motion with respect to Bolton's race discrimination claim to the extent Bolton claims disparate treatment related to his training, but grants it in all other respects. The Court also grants Bay Valley's motion for summary judgment with respect to Bolton's disability discrimination claim.

A corresponding order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ARTHUR T. BOLTON,            )      Case No. 3:17-cv-69
                                   )
        Plaintiff,           )      **JUDGE KIM R. GIBSON**
                                     )
        v.                     )
                                     )
BAY VALLEY FOODS, LLC,      )
                                     )
                                     )
        Defendants.        )

## ORDER

NOW, this _13th_ day of April, 2020, the Court **GRANTS IN PART** and **DENIES IN PART**

Bay Valley Foods, LLC's, Motion. The Court **DENIES** Bay Valley Foods, LLC's, Motion for

Summary Judgment on Arthur T. Bolton's race discrimination claim on the basis of disparate

treatment related to his training but **GRANTS** it in all other respects. The Court **GRANTS** Bay

Valley foods, LLC's, Motion for Summary Judgment on Arthur T. Bolton's disability

discrimination claim.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE